PAUL J. STEINER, ESQ. [SBN 41117]
LAW OFFICES OF PAUL J. STEINER
580 California Street, 12th Floor
San Francisco, CA 94104
Telephone: (415) 981-6100
Facsimile: (415) 984-0950
Email: paul@sfpaulaw.com

FRANK F. SOMMERS, IV [SBN 109012]
SOMMERS LAW P.C.
1 Embarcadero Center, Suite 800
San Francisco, CA 94111
ffs@SommersLawPC.com
Telephone: (415) 308-4004

Attorneys for Assignees, Judgment Creditors and
Plaintiffs Seth Samuels, Stephen Samuels, Stacy
Samuels, Chateau De Louis, LLC, No. Nine LLC,
and Real Enterprises, LLC

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| SETH SAMUELS, an individual; STEPHEN SAMUELS, an individual; STACY SAMUELS, an individual; CHATEAU DE LOUIS, LLC, NO. NINE LLC, and REAL ENTERPRISES, LLC; <br><br> Plaintiffs, <br><br> v. <br><br> LIBERTY SURPLUS INSURANCE CORPORATION; and DOES 1 through 10, inclusive; <br><br> Defendants | Case No. 3:24-cv-02744-EMC <br><br> **PLAINTIFFS' FIRST AMENDED COMPLAINT FOR:** <br><br> 1. **Breach of Contract (As Assignees and Judgment Creditors)** <br> 2. **Breach of the Implied Covenant of Good Faith and Fair Dealing (As Judgment Creditors)** <br> 3. **Breach of Contract (As Assignees)** <br> 4. **Breach of the Implied Covenant of Good Faith and Fair Dealing (As Assignees)** <br><br> **DEMAND FOR JURY TRIAL** |

1

Plaintiffs' First Amended Complaint for Damages

## I. INTRODUCTION

Plaintiffs allege:

1.     This case arises out of a successful legal malpractice action against Defendant's insureds. Plaintiffs Seth Samuels, Stephen Samuels, Stacy Samuels, Chateau De Louis, LLC, No. Nine LLC, and Real Enterprises, LLC (collectively "PLAINTIFFS" or "SAMUELS"), as Assignees, Judgment Creditors and Plaintiffs, allege, based on their own knowledge with respect to their own actions and on information and belief with respect to all other matters, as follows for a complaint for insurance bad faith against defendant Liberty Surplus Insurance Corporation ("LIBERTY" or "DEFENDANT"), which breached its duties to its insured under a $2 million professional Errors & Omissions policy, when confronted with a demand below the then-existing policy limits, and rejecting it, thus leaving their insureds open to a much greater liability.

2.     Defendant LIBERTY issued an errors and omissions policy of insurance to Hamrick & Evans, LLP. An authentic copy of the errors and omissions policy of insurance issued to Hamrick & Evans, LLP is attached as **Exhibit 4**. As described herein Defendant LIBERTY breached its duties to defend, settle, and/or indemnify the claims alleged against its insureds, who were the defendants in the underlying litigation: Hamrick & Evans, LLP, A. Raymond Hamrick (jointly, "HAMRICK") and Kenneth GREENE ("GREENE"). (HAMRICK and GREENE are collectively referred to as "INSUREDS"). PLAINTIFFS hired the INSUREDS pursuant to a written contract to collect PLAINTIFFS' $1.8 million Judgment that the PLAINTIFFS had obtained in previous legal proceedings. Thereafter, the INSUREDS negligently handled the collection, which was imminently collectible, causing PLAINTIFFS substantial damage.

3.     The malpractice that is the subject of this action falls into four separate areas:

a. The failure to defend against the underlying defendants', the PW OWNERS, summary judgment motion, which allowed those individuals, the PW OWNERS, to be dismissed from liability; and GREENE'S consequent abandonment of the state collection action itself;

b. The bungling of the actions GREENE and HAMRICK recommended be filed against the window manufacturer (defective windows being a major source of the damages) and against the insurer of the PW OWNERS, Everest Insurance Company;

2

Plaintiffs' First Amended Complaint for Damages

c. Failing to properly pursue those individuals when the Bankruptcy court claims reopened their potential liability; and

d. Using false claims about the "million dollars" in fees they had billed after promising the work would be on contingency and to extort PLAINTIFFS to surrender a large portion of the bankruptcy Court's collection action proceeds, and a release of them from claims against them by PLAINTIFFS in return for the assignment of INSUREDS' rights against LIBERTY under the policy in issue.

5. All of the evidence showing how malpractice was committed in these areas was available to LIBERTY in 2016 at the time of the demand letter made here.

## II. THE PARTIES AND DEFINITIONS

5. Plaintiff SETH SAMUELS, is an individual over the age of 18 and is a resident of Marin County, California. SETH SAMUELS is, and at all relevant times was the sole owner of all shares of plaintiff CHATEAU DE LOUIS, LLC.

6. Plaintiff STEPHEN SAMUELS is an individual over the age of 18 and is a resident of Sonoma County, California. STEPHEN SAMUELS is, and at all relevant times was the sole owner of all shares of plaintiff NO. NINE, LLC.

7. Plaintiff STACY SAMUELS is an individual over the age of 18 and is a resident of Marin County, California. STACY SAMUELS is, and at all relevant times was the sole owner of all shares of plaintiff REAL ENTERPRISES, LLC

8. Jointly, SETH SAMUELS, STEPHEN SAMUELS and STACY SAMUELS and their respective wholly owned limited liability companies are referred to herein as "PLAINTIFFS". The individual plaintiffs are referred to by their first names and are jointly referred to as the "INDIVIDUAL PLAINTIFFS"

9. Based on information and belief it is alleged that Liberty Surplus Insurance Corporation is corporation organized under the laws of the State of New Hampshire with its principal place of business in Boston, Massachusetts and which is authorized to, has and does sell insurance in the State of California

3

Plaintiffs' First Amended Complaint for Damages

10.    The true names or capacities, whether individual, corporate, associate, or otherwise, of DEFENDANTS DOES 1 through 10, inclusive, are unknown to PLAINTIFFS, who therefore sues said DEFENDANTS by such fictitious names. PLAINTIFFS are informed and believe and thereon alleges that each of the Defendants sued herein as a DOE is legally responsible in some manner for the events and happenings referred to herein. PLAINTIFFS will ask leave of this Court to amend this Complaint to insert the true names and capacities of the fictitiously named cross-defendants in place and instead of the fictitious names if and when the same becomes known.

11.    The term INITIAL LITIGATION means and refers to the case PLAINTIFFS brought against the construction contractors and others identified as *Chateau De Louis, LLC, et. Al. vs. Pinewave Construction, Inc., et. Al.*, San Francisco Superior Court Case No. CPF-05-505736.

12.    The term "UNDERLYING LITIGATION" or "COLLECTION CASE" means and refers to the legal malpractice case PLAINTIFFS brought against the INSUREDS and identified as *Seth Samuels, et. Al. vs. Hamrick & Evans, LLP, et. Al.* San Francisco Superior Court Case No. CGC-13-534626.

## BASIS FOR JURISDICTION

13.    Under 28 U.S.C. § 1332, a case in which a citizen of one state sues a citizen or corporation of another state or nation, and the amount is over $75,000, is a diversity of citizenship case.

### I.    Summary Background.

### A. The Original Construction Defects Claims

14.    The underlying lawsuit was for construction defects committed by the general contractor which was building three high-end residential and commercial buildings on three properties, respectively each owned by one of the Samuels brothers, located in the Outer Sunset District of San Francisco. The work resulted in numerous construction defects which became the subject of a lawsuit by the SAMUELS against the contractor and others. A lawsuit against the contractor was filed in 2004 and arbitrated pursuant to contract clauses requiring such procedure.

4

Plaintiffs' First Amended Complaint for Damages

15.    The arbitration concluded in 2005 with an Award of nearly $1.8 million award against the contractor. The Award was duly confirmed and converted to a judgment by the Superior Court. The firm that represented the SAMUELS in the arbitration did not handle collection matters, and the SAMUELS therefore hired a firm named Rutan & Tucker ("Rutan"), which handled collections; and thereafter replaced Rutan with INSUREDS who took over as the collection attorneys.

16.    The underlying construction contractor, Pinewave Construction Company, Inc. (PW1), was owned by several Chinese nationals and families, the PW OWNERS, with extensive United States' property holdings (herein jointly "the PW OWNERS") and who owned a web of closely held and controlled companies that covered nearly all aspects of real estate development which they used to defraud against PLAINTIFFS' collection efforts, by engaging PLAINTIFFS in a grinding battle of discovery lies, fraudulent asset transfers and other actions to conceal their assets and involvement that set them up for alter ego findings, and which consumed years of litigation.

17.    Defendant GREENE was introduced to the SAMUELS in 2007. He convinced them that prior counsel Rutan was mishandling the collection action. PLAINTIFFS hired him as that counsel's replacement. Almost immediately thereafter GREENE joined Hamrick & Evans and moved his office to Southern California. It was GREENE and the Hamrick Firm's handling of the file after he joined the Hamrick Firm that began the malpractice upon which the verdict that is in dispute here was based.

18.    Once the SAMUELS discovered the construction defects and began complaining about them in late December 2003, the PW owners immediately began a series of fraudulent. transactions aimed at insulating themselves and their construction company, Pinewave Construction Inc, [hereinafter PW1] from personal liability from any award.  Thus, in January 2004 the PW Owners formed and started a new construction company and began transferring the assets of Pinewave Construction Inc. herein PW1 to a newer corporation, PW Commercial Construction Inc. herein known as PW2.  By the time the INSUREDS had come on the scene in 2007, the SAMUELS and their previous collection attorneys, Rutan & Tucker, LLP ("Rutan"), had done the below-described discovery and investigation and gathered the following evidence

Plaintiffs' First Amended Complaint for Damages

to show and prove the Samuels' claims. The evidence set out below took years of discovery and sanctions motions, as well as depositions of the corporate designees. Because of the PW Owners' resistance, it took until 2006 to secure the depositions of the PW Owners' corporate designees. The SAMUALS spent well over $350,000 in doing so.

19.    From the evidence that the PLAINTIFFS had amassed, and the 2006 sworn testimony of Gavin Lam for PW1 and the sworn testimony of Edwin Law of PW2, Plaintiffs learned that the accounting for all the various PW related entities had been kept on the PW1 networked computer server. They also learned that all the accounting for all the PW-related entities was done on the QuickBooks accounting program owned by PW1 and that it was all still there on the PW1 network server in August of 2006 and only Edwin Law or the PW employee who was the internal accountant for all the related PW corporate entities had access to it.

20.    At the time of the July and August 2006 examinations, the SAMUELS were told that those further requested accounting and business files were missing because PW1 had sold all of its computers and electronically stored information ("ESI") programs and files that were on the network server; and that they had been purportedly sold by PW1 to PW2 only days prior to the August 2005 Arbitration.

21.    Eventually, Rutan's computer and accounting expert forensically determined that the bill of sale for those computers that was presented to the SAMUELS at that examination was a fake and that the computers and data had not been sold as claimed, before the August arbitration in 2005, but rather were sold and transferred to PW2 only *after* the arbitrator had rendered his decision in favor of SAMUELS for an award of $1.8 million.

22.    Following those two examinations, in December of 2006, Rutan filed a suit for alter ego against the PW OWNERS and some of their PW related entities. At the early 2007 State Court hearing on that matter, it was learned that PW2, which allegedly had all the accounting information and business files on the server that it had bought from PW1, had filed Chapter 11 bankruptcy. That Bankruptcy was filed by PW2 immediately after Rutan had again filed actions in State court to obtain those material requested missing records. Obviously, the PW OWNERS had been playing a game of keep-away from the SAMUELS with the materially relevant missing requested records that were needed to prove their claims.

23.    In 2005 and 2006 PW2 admittedly had just had the best financial construction years of its existence as well as PW1's existence. Nevertheless, the PW2 OWNERS had filed bankruptcy for PW2 in order to prevent the SAMUELS from obtaining the fraudulently

Plaintiffs' First Amended Complaint for Damages

transferred information that should have been tendered years previously for the Arbitration and more than a year previously for the two 2006 Examinations.

24.    After a further six months of trying to obtain those fraudulently transferred computer files that were being illegally withheld by the PW related entities' OWNERS, at a November 14, 2007 bankruptcy hearing which was held to obtain that evidence, it was learned that PW2 had converted from a Chapter 11 to Chapter 7 Bankruptcy.  Again, the PW OWNERS further prevented the SAMUELS from obtaining the critical, missing computer accounting evidence that had been requested was material and relevant but being actively concealed.

**B The Transfer to GREENE and HAMRICK**

25.    By the middle of 2007, the SAMUELS had paid out over $350,000 to compile the evidence, over $250,000 of which had been paid to Rutan, but, unfortunately, along with their forensic accountant and computer expert, they had made some material errors.  Or at least GREENE had so represented and led the SAMUELS to believe that which induced them to transfer the collection of the judgment to GREENE and ultimately to the INSUREDS.

26.    In 2019, San Francisco Superior Court Judge A. James Robertson, II, after hearing the evidence during a lengthy bench trial, ruled *inter* alia, that by time of that 2008 bankruptcy trustee hearing on the PW2 Chapter 7 filing, the SAMUELS had obtained the rights to all the evidence necessary to prove their alter ego claim against the PW OWNERS.  By April of 2008 the SAMUELS had finally obtained forensic copies of that further missing evidence from the PW2 Bankruptcy Trustee.  Furthermore, by 2006 it had been ascertained that the PW OWNERS had real estate assets worth well over $10 million that had no encumbrances or liens on them. The PW OWNERS also had further assets and cash.  Thus, it was known and could be shown that the SAMUELS' claim was easily collectible.

27.    Nevertheless, the INSUREDS went from error to error.  Stated simply, the INSUREDS utterly failed to develop the necessary available evidence of the alter ego transactions; failed to do timely, effective discovery; failed to take proper examinations, failed to hire and disclose experts properly, all of which caused Judge Patrick Mahoney of the San Francisco Superior Court to severely chastise GREENE in early 2009 during summary judgment proceedings that resulted in the dismissal of the only financially viable underlying defendants, the PW OWNERS.  Thereafter, the INSUREDS represented to PLAINTIFFS that they could make up for their errors through remedial litigation including a spoliation hearing to show that

Plaintiffs' First Amended Complaint for Damages

OWNERS concealed or destroyed evidence, as well as suing the insurance carrier of the PW OWNERS. The INSUREDS assured PLAINTIFFS these proceedings would accomplish the collection of PLAINTIFFS' $1.8 Million judgment. As noted above, each of these proceedings was badly bungled by INSUREDS. After messing up the claims against the PW OWNERS, HAMRICK pursued a case against the OWNERS' insurance carrier. The INSURED also mishandled that case. Accordingly, it also failed.

28. In 2013 PLAINTIFFS sued INSUREDS asserting professional negligence and other claims. PLAINTIFFS ultimately obtained a judgment as of February 20, 2019 in the amount of $4,502,807.48 after a court trial. The INSUREDS appealed. The First District Court of Appeal ruled against them on liability on November 24, 2021 but disagreed with the court's interest calculation on damages and remanded with instructions for the parties and court to resolve the issues, primarily regarding pre-judgment interest.

29. Pursuant to the instructions of the Court of Appeals, the parties entered into negotiations to agree on the amount which would be considered the judgment amount that the trial court should have arrived at. That stipulation was filed on May 3, 2023 and accepted by the trial court which entered the judgment in the sum of $5,638,664 as of February 1, 2023.

30. The parties have further agreed that the instant complaint should be assigned to Judge Chen, who has previously dealt with a declaratory relief complaint filed by LIBERTY, which was dismissed after motions by PLAINTIFFS. As of the date of this filing, that has occurred.

31. Prior to obtaining the judgment at trial, and with the evidence of the INSUREDS' multiple acts of negligence clearly evident and provable, and the INSUREDS having caused further damages far in excess of solely the uncollected $1.8 Million judgment plus interest, PLAINTIFFS offered in 2016 to settle the COLLECTION CASE with LIBERTY for amounts within the then available limits of the INSUREDS' applicable malpractice insurance policy. LIBERTY refused to accept the settlement offer; and failed to offer reasonable settlement terms during that time. Plaintiffs' demand was for $1.45 Million. LIBERTY offered $500,000, which PLAINTIFFS rejected. Years later, after trial and appeal, PLAINTIFFS presented the revised judgment to LIBERTY for payment, but LIBERTY refused to pay the judgment except for the sum of $729,990.94, the amount still unspent by LIBERTY on the INSUREDS' malpractice policy. The parties acknowledge that Judge Chen has already ruled that there is only one $2 Million policy available for this action.

Plaintiffs' First Amended Complaint for Damages

32.    PLAINTIFFS, as both judgment creditors and assignees of all rights under the INSUREDS' errors and omissions policy, now bring this action against LIBERTY and Does 1-10, inclusive, for breach of contract and breach of the duty of good faith and fair dealing and other related law.

## FACTUAL BACKGROUND

### The Collection Case and the Underlying Litigation

33. This case arises from attorney malpractice committed by the Hamrick & Evans, LLP, law firm and attorneys A. Raymond Hamrick ('HAMRICK") and Kenneth Greene ("GREENE") (collectively "UNDERLYING DEFENDANTS' or "INSUREDS") resulting from their multiple acts of negligent handling the collection of PLAINTIFFS' approximately $1.8 million Judgment obtained by prior counsel in arbitration. The underlying litigation is referred to herein as THE "COLLECTION CASE". The entire saga took a long and twisted path of 13 years through several San Francisco courts, several judges and both Superior and Bankruptcy courts, finally reaching a bench trial that began in 2018 in San Francisco Superior Court. It concluded in February 2019 with a judgment against the INSUREDS for $4,502,807.48. The INSUREDS appealed. The Court of Appeals affirmed the decision on liability but remanded with instructions to recalculate interest damages. After significant back and forth, the parties stipulated to a judgment amount of $5,638,664, the increase being the stipulated post-judgment interest and the daily interest add rate on that sum. The trial court approved the stipulation, and a corrected Judgment was entered in May 2023.

### Brief Summary of Maneuvers by Contractor Defendants and Failures by Insureds Constituting the Malpractice Known to Liberty

34.    The malpractice claims against the INSUREDS, on which the claims of bad faith failure to settle against LIBERTY are based, includes the INSUREDS' failures to pursue and win alter ego liability against the OWNERS of the construction firm that was originally found liable for their construction defects and damages. Those individual OWNERS for years fraudulently maneuvered, concealed, and transferred assets at will by moving them among and between various corporate entities in a game of hide and seek, e.g. Pinewave Construction Company ("PW1") to Pinewave Commercial Construction Corporation ("PW2") as well as various other corporate entities, owned and/or controlled by those same individuals, the PW OWNERS. They also destroyed, fabricated, and concealed evidence of their ownership and actions such as the

9

Plaintiffs' First Amended Complaint for Damages

movement of funds, contracts and assets to try and keep ahead of PLAINTIFF's collection efforts. Later GREENE disparaged the work of the original collection attorneys as part of his efforts to convince the SAMUELS to move the case, first to him, and then to HAMRICK.

35.    The INITIAL LITIGATION began when PLAINTIFFS hired Pinewave Construction Inc, a licensed contractor, ("PW1") to build three high-end multi-unit combined residential and commercial buildings on Noriega Street in San Francisco, California, one for each of the individual plaintiffs and his wholly owned LLC. The project broke ground in September 2002 with a scheduled completion date of 2003. In December 2003 PLAINTIFFS were called to inspect the project's progress and discovered major defects. PLAINTIFFS requested that PW1 fix the defects. After unacceptable attempts to address the defects, PW1 stopped working on the project. By April 2004 PW1 walked off the job, filed a mechanic's lien and thereafter sued the Plaintiff LLC's for its 10% retention money. The case then proceeded to arbitration where PLAINTIFFS counter-claimed and obtained a $1.8M award against PW1 that was reduced to a judgment in San Francisco Superior Court in 2005 ("PW Judgment"). During the arbitration process, PLAINTIFFS requested the accounting records from PW1 but they were never received. PW had started its program of keep away.

36.    In December of 2005, PLAINTIFFS hired the Rutan law firm to collect the PW1 Judgment. Rutan undertook extensive investigation pursuing collection of the PW1 Judgment at substantial cost to PLAINTIFFS. In or around January of 2004 and aware of their potential liability to the SAMUELS, the OWNERS of PW1 to escape payment, opened their newly formed corporation, PW Commercial Construction Corporation, ("PW2") and transferred many of PW1's assets to it. Thereafter PW2 filed for Chapter 11 Bankruptcy and then Chapter 7 Bankruptcy. In or around spring of 2007, PLAINTIFFS hired attorney GREENE, who represented himself as an expert in bankruptcy litigation. Thereafter they again hired him pursuant to a written agreement to take over handling collection of the PW1 Judgment because of several alleged errors by the Rutan law firm which GREENE identified in his successful effort to secure the business.

37.    In 2007, PW2 converted its case to a Chapter 7 Bankruptcy, and by the beginning of 2008 the Bankruptcy Court Trustee ("Trustee") took charge of the remaining PW2 assets including fraudulently conveyed electronically stored information [ESI], or computer data. Before the August 2005 arbitration the PW OWNERS had fraudulently alleged that it had transferred their PW1 computers with all of the Pinewave related entities' ESI to PW2, thus

10

Plaintiffs' First Amended Complaint for Damages

playing keep-away from the SAMUELS. PLAINTIFFS had learned during the 2006 PW2 examination of Edwin Law, PW2's owner-spokesperson, that all of the PW related entities kept their data in a single QB accounting program owned by PW1. All the PW related entities used the same accountant, Dave Lau, who input the ESI for all PW related entities to that single program and from there exported the financial data for each entity to create their respective financial statements and created a consolidated financial statement showing the data on all PW related entities. This QB program was kept on the PW1 server, which was represented as sold to PW2 prior to the arbitration. It was later learned that representation was false. The transaction actually took place *after* the arbitration and *after* PW1 was ordered to turn over all the files. This data also shows that the PW related entities are owned or controlled by the same people who could move money at will from one entity to another, playing musical chairs, confirming earlier information PLAINTIFFS had acquired from the Secretary of State and other public records. During all of the time involving the dispute between PLAINNTIFFS and any Pinewave or PW related entity, the PW OWNERS and the related entities were represented by the same or related law firms. By 2016, when LIBERTY received PLAINTIFFS' settlement demands, they knew or should have known all of these facts.

### GREENE and HAMRICK
### (The PW2 Collection Case in State Trial Court and Bankruptcy Court)

38.    **INSUREDS Take Over Collection Case.** In or about December of 2007, GREENE associated with HAMRICK, which asked to take over the collection of PLAINTIFFS' judgment claim. GREENE stated to PLAINTIFFS that he and his new firm were experts in collections, successor liability and alter ego as well as construction insurance matters and construction defect law. In January 2008, GREENE, now with HAMRICK, prepared a budget based upon PLAINTIFFS' and Rutan's four-step plan to win on successor liability and alter ego. The plan was to bring in the common owners of the Pinewave entities, who owned and controlled all of the assets as *alter egos,* by taking the following steps:

- To subpoena the accounting records of the related PW entities, which had been found on the PW 2005 [and 2006] spreadsheets that evidence the consolidated accounting and financial data of the related PW entities.
- To take one deposition of the OWNERS' internal accountant for PW1; PW2 and the other PW related entities.

Plaintiffs' First Amended Complaint for Damages

- To get the fraudulent records and transfers introduced by a forensic accounting/computer expert witness.

- Go to trial.

39. Having already spent many hundreds of thousands of dollars on attorney's fees and costs pursuing the judgment and evidence for the collection, PLAINTIFFS explained to GREENE that they had very limited money left to fund the litigation. GREENE's budget shows that he could implement the Rutan plan for less than $150,000. Following that, Ray Hamrick claimed he could collect the award from the Everest insurance company, the PW Owners' insurer, for $50,000 including a trial.

40. The INSUREDS moved ahead with the collection case but made numerous errors. The errors included, *inter alia,* failure to properly defend a summary adjudication motion that allowed dismissal of the PW OWNERS, the only financially viable persons from whom to collect the judgment. Amongst other errors, the INSUREDS:

a). failed to conduct discovery necessary to establish the alter ego or successor claims, including not issuing enforceable subpoenas for computers, files and documents.

b) after firing two qualified accounting experts and allowing discovery to close, GREENE failed to timely secure a replacement qualified expert to support the introduction of the existing evidence of the alter ego status of the OWNERS. Then in an effort to defeat the summary proceedings, GREENE drafted a declaration reciting the alter ego evidence for Seth Samuels to present, but failed to timely or properly introduce the evidence that would enable Seth Samuels to qualify to render the supporting opinions even though Seth possessed such qualifications. Thus, the judge granted the underlying PW defendants' motion and dismissed the claims against the PW OWNERS.

c) thereafter, having been forced to dismiss the collection claims against the individual defendants the INSUREDS told the Samuels that they would still be able to collect in the Bankruptcy Court proceedings then in progress. So, the INSUREDS failed to properly pursue the PW OWNERS to prove fraudulent transfers, concealment and willful destruction of evidence by the PW OWNERS, as they had promised PLAINTIFFS they would do.

d) Threatening to walk off the job, the INSUREDS in lieu of receiving the PW Owners' funds in 2012 held by the Bankruptcy court, took $130,000 from Stephen Samuels forcing him to sell his real property; and then also demanded that same amount of money

Plaintiffs' First Amended Complaint for Damages

back from the limited funds acquired by the Bankruptcy Trustee in 2013. Fearing collateral estoppel due to the poor results that GREENE had obtained in state court, they would not proceed further with trial in the Bankruptcy court, as they had assured the SAMUELS that they would, unless they were paid further money. These limited funds were by that time desperately needed by PLAINTIFFS to support the on-going Window litigation, which GREENE continued to insist was viable.

41. **Unsuccessfully Defending Summary Adjudication Motion**. At the December 2008 through February 2009 Summary Adjudication hearings, Superior Court Judge Mahoney dismissed most of PLAINTIFFS' alter ego claims against the individual owners because GREENE had failed to qualify an expert accounting witness to present the fraudulent money maneuvers, including alteration of records. When GREENE tried at the eleventh hour to replace the accounting experts he had fired with Seth Samuels' declaration, he failed to properly set forth the evidence of Seth Samuels's accounting education, training and experience. Seth Samuels had the requisite training and experience to qualify him to present such evidence. Without knowledge of such evidence, Judge Mahoney held in his tentative ruling ruled that Seth did not qualify as an expert. In response to GREENE's protestation and proffer of new forensic computer expert testimony and evidence, Judge Mahoney admonished him stating that he had more than a year to get a computer expert but had not done so. Accordingly, GREENE'S failure to properly qualify an accounting expert and introduce the necessary evidence of the fraudulent transfers resulted in the dismissal of the PW OWNERS as alter egos of the contractor corporations. The judge retained the claims for successor liability and alter ego of the two corporations, PW1 and PW2, but those assets all controlled by the now-dismissed OWNERS had all been transferred.

42. **Promise to Correct Errors on Contingency.** Had PLAINTIFFS prevailed on alter ego and successor liability against the PW OWNERS, PLAINTIFFS would not have had to file further claims or to have had the INSUREDS extensive, mostly unsuccessful corrective legal work done. After the ignominious dismissal of the PW OWNERS by Judge Mahoney, GREENE and the three PLAINTIFFS met in person. At that meeting GREENE requested that PLAINTIFFS not sue him and advised them to rely on his remedial work as well as the deep pockets of Everest Insurance; and International Windows Corporation, the manufacturer of the substandard windows installed at the project that formed a large component of the defect damages awarded in the arbitration Award and Judgment, to set matters straight. He told PLAINTIFFS that he/or the firm would do those cases on contingency, and that the Trustee will

Plaintiffs' First Amended Complaint for Damages

get the money from the PW OWNERS, since the Trustee had filed a similar claim. GREENE'S comment at that meeting was, "let's not fight among ourselves, let's get the bad guys".

### INSUREDS' Negligent Attempts to Correct Their Errors.

43.    The INSUREDS spent the next nine months trying to correct errors they created in state court as follows:

- Making unsuccessful motions trying to reopen discovery;
  - Making motion unsuccessfully trying to get one of the two previous expert witnesses re-qualified.
- Making motion unsuccessfully trying to get a new expert witness admitted.
  - INSUREDS tracked their time and billed PLAINTIFFS for these efforts as well as efforts to collect from the Contractor's Insurance company and a further claim against the Window manufacturer.
  - They made the SAMUELS pay them in full up to the trial date, with the SAMUELS under the belief that the new forensic accountant, Claudia Berglund, would be able to testify. Only a day or two before that trial but after paying all the legal fees as well as $10,000 for Berglund's work did the SAMUELS learn that Berglund would not be allowed to be an expert, and that GREENE intended to use Seth Samuels' declaration instead.
  - The INSUREDS claimed in 2013 that the SAMUELS owed them in excess of $1 Million, despite their prior promise rectify their errors and omission and to do the work on a contingency basis.

44.    **INSUREDS Demand More Money.** In 2011, despite promises and assurances to PLAINTIFFS they would and could make up for their multiple errors and that they still could collect the judgment, Hamrick demanded more money or they would abandon PLAINTIFFS. The INSUREDS threatened to abandon the claims unless PLAINTIFFS signed a new promissory note obligation. Then again in 2013, after winning a determination in Bankruptcy court that PW1 and PW2 were alter egos and successors, HAMRICK, regardless of the past assurances to the contrary, demanded the SAMUELS also sign a note obligation to them for $1,000,000 above and beyond the approximately $233,000 left in the Bankruptcy collection account; and to release INSUREDS from further liability and accept a full assignment of their policy rights. Given the risks imposed by the INSUREDS demands, and having exhausted their funds and having no

14

Plaintiffs' First Amended Complaint for Damages

other option considering the risks imposed by the INSUREDS' demands, PLAINTIFFS sought advice and agreed.

45. **Mishandled Spoliation Hearing**. Unilaterally and without discussion with PLAINTIFFS, GREENE decided to seek to remove the automatic stay in the Bankruptcy Court so that he could proceed in state court against PW2 as well as the PW OWNERS. The Trustee and the Bankruptcy Court allowed it. GREENE scheduled the trial on successor liability for June 2009 in the state court and then asked for a hearing on spoliation of evidence before that trial. The spoliation hearing spanned several weeks and lasted more than six full days. The judge asked that GREENE show him what evidence he, GREENE, had requested to prove the claims, that was missing, hidden or destroyed by the underlying defendants, and that was relevant and materially needed to prove PLAINTIFFS' claims.

46. In or around the late Summer 2008 when the Bankruptcy Trustee was able to access the rest of the PW computers that had been placed in storage and not surrendered to the Trustee, it was learned that the PW OWNERS had wiped all the ESI from all of their computers. As many business records were missing or incomplete, both the Trustee and PLAINITIFFS had expected to find such information on those other computers. The forensic computer expert had opined that the purported PW OWNERS' "original" networked server, was actually a fabrication made to look like it had been a networked server. So, although the Bankruptcy Court and the Trustee had ordered the PW OWNERS to preserve all the business records the Trustee and PLAINITIFFS only received two hard drives; one was purported to be the Original hard drive from the networked computer server and had been removed from the computer housing. The other hard drive was labeled as a "**copy** of that network server". Nevertheless, the hard drive that was claimed to be the original network server did not have the QuickBooks ("QB") accounting information of any of the PW related entities on it except PW2. The PW1 QB accounting file had been given separately in 2007. It only had one of the principal and material relevant PW corporations was on it. That accounting file, however, was found on the "*copy*" of that network server only because it had been deleted and thrown into the Recycle Bin. However, they forgot to empty or delete the contents of the Recycle Bin so it still had that one of the PW related entities' QB files, that of Pinewave Development Group, one of the major PW related entities. But, despite having been told that the files were there, all other PW related entities' files were missing. So, all the QB accounting files of the PW related entities which were supposed to be on the PW networked server were missing except for one PW entity named Pinewave Development

Plaintiffs' First Amended Complaint for Damages

Group. However the financial statements for all of those companies for years 2005 and 2006 had been exported to an spreadsheets for each of those years

47.     During the spoliation hearing, PLAINTIFFS repeatedly requested that GREENE present and explain that the missing QB accounting that had been requested and was missing but hidden and later discovered only as financial statements without all the underlying and supporting accounting data of the 2005 and 2006 PW related entities. i.e. exported as financial statements, consolidated onto spreadsheets. That contained the financial statements imported from the one QB file that belonged to PW1, but which was used to create the accounting for each of the PW related entities on the networked server. So, the QB program belonged to PW1. Those financial statements of the PW related entities accounting files evidenced much of the fraudulent transfers, but not the underlying data that would be found in the supporting QB file from which the financial statement was compiled. When GREENE asked to introduce Everett Harry, an experienced, well-qualified forensic accountant, as a witness as well as the 2009 Harry forensic accounting report which contained analysis of the recovered PW financial statements on those spreadsheets, the judge asked him why. GREENE responded, "to show dissipation of assets". The proffer was denied. The Judge ruled that such evidence as dissipation of assets was irrelevant in a spoliation hearing and belonged in the trial.

48.     PLAINTIFFS repeatedly requested that GREENE correct his position from attempting to prove dissipation of assets to showing that the recovered PW spreadsheets and accounting records showed that the QB accounting files for all the PW related entities had been removed from the purported PW Networked Server; only one of those PW related entities files remained. That had been removed and put in the recycle bin, but not yet deleted from the recycle bin as all the other related companies QB files had been. As demonstrated by their financial statements, those PW Related companies accounting files would have shown how the money was transferred to defraud the PLAINITIFFS. The 2006 examinations testimony established that the QB files would be there. The spreadsheets however did show the financial statements for those PW related entities. So, the PW Related companies accounting files that had the underlying data had been removed and concealed, except for one company, PW Development Group. The QB accounting for PW1 had been produced separately as had the QB accounting file for PW2.

49.     At the hearing, GREENE explained through a computer expert how the PW OWNERS had produced false hard drives and had wiped the computer data from those hard drives. But GREENE did *not* explain that the PW OWNERS had inadvertently left an

16

Plaintiffs' First Amended Complaint for Damages

informative file in the Recycle Bin of the produced "copy" hard drive which revealed some of the chicanery of the PW OWNERS. Those facts showed how, except for the QB files of PW1 and PW2, the PW OWNERS had removed from the computers all the QB files of all the PW related entities, which one of the owners testified in 2006 were still on the hard drive. Those QB accounting files for all the PW related entities, the financial statements of which had been fully authenticated by the PW OWNERS' internal accountant in 2009, showed exactly what the Judge had questioned: what had been requested but was missing, relevant and material. That accounting data allows one to follow the fraudulent transfers and manipulations of the assets of the PW OWNERS that allowed them to keep their assets away from PLAINTIFFS in their attempt to collect their judgment.

50.     Further, those missing requested materially relevant files also showed the fraudulent transfers from the construction companies to the other PW entities, and that was what was needed to follow the money and had been requested but was missing, relevant and material to prove PLAINTIFFS' claims. GREENE refused to change his rationale for seeking admission of this crucial evidence until the end of the last day of trial. Then, seeing that he was losing the case, when he finally tried to argue this evidence for the purpose of showing spoliation and the ruse by the PW OWNERS, the Judge asked him why he had not explained this earlier during the evidentiary presentation? GREENE replied that he did when he tried to introduce the Harry report. The PW Attorneys as well as the judge then confronted GREENE that he had consistently claimed that he was trying to show "dissipation of assets" and did not make any references to the fact that he was wanting to introduce crucial evidence which was requested, missing, material or relevant to prove the claim.

51.     Most importantly, at that hearing, GREENE failed to introduce into evidence the files received index that prior counsel had prepared which indexed all the evidence that the PW OWNERS had produced. San Francisco Superior Court Judge Harold Kahn had ruled in the spoliation hearing that PLAINTIFFS could not prove what evidence was missing because they did could not prove what the underlying defendants had produced; and if you did not know what was produced, you cannot prove what if anything was missing from it. Rutan had specifically had his legal assistant make such an index to avoid this from happening. GREENE had the evidence of what was produced, the materials produced index, but failed to offer it into evidence. (In June of 2010, in Bankruptcy Court, Judge Newsome also brought that up and again GREENE

Plaintiffs' First Amended Complaint for Damages

failed to mention that he actually did have such an Index of what the PW OWNERS had supplied as of those examinations).

52.    Despite PLAINTIFFS' efforts to have him correct his position, GREENE had apparently misunderstood the case and refused, until it was too late. These failures to understand and explain the facts of what was requested, material and missing, lead to the loss of the spoliation hearing as it had not been proven though the evidence was there to prove it. Consequently, PLAINTIFFS lost the spoliation case.

53.    **GREENE Withdraws Case Costing PLAINTIFFS $30,000.** After losing the spoliation case, GREENE in late 2009 withdrew PLAINTIFFS' claims in the state trial court because he was not prepared to move forward on it and he also told PLAINTIFFS that the bankruptcy trustee was prosecuting an almost identical case as PLAINTIFFS state trial court claim but against PW and its owners in bankruptcy court.

54.    PLAINTIFFS' state court claim was dismissed by GREENE without prejudice but without agreement from the PW owners to waive costs. The PW entities filed a cost bill for their costs. In addition to all the ancillary legal costs that PLAINTIFFS had incurred, they then had to pay PW's state trial court costs in the amount of approximately $30,000 plus interest—this despite GREENE's assurances to PLAINTIFFS that he had negotiated a "walk away" no cost exit.

55.    Had either or both the PW Collection and the spoliation hearing been successful, PLAINTIFFS would not have had to file further actions. They would have collected the millions owed them and further millions in damages caused by fraud. That money was collectable as the PW owners owned property in California free and clear that was worth well over $10 Million, and some of those owners had considerable personal wealth well beyond that. PLAINTIFFS did not prevail solely because of GREENE's errors and omissions. Furthermore, the PW OWNERS' assets amongst elsewhere were listed on those above- mentioned concealed and/or deleted financial statements.

56.    LIBERTY had access to all of the facts listed thus far and had they reasonably analyzed them, as they were obligated to do, with persons they had retained to do so, they would have known these facts to be true. The collectible assets were known by the INSUREDS who inquired prior to accepting the case and were provided the information by PLAINTIFFS as that information was discovered when Rutan compiled the evidence in 2006.

Plaintiffs' First Amended Complaint for Damages

**The Bankruptcy Court/Judge Lafferty Decision:**
**Judge Lafferty's Ruling: PWCCI Is the Successor to PWC Under California Law, And Thus, Liable for Claims Against PWC**

57.    Nevertheless, although repeatedly requested by PLAINTIFFS, HAMRICK did not bring up the most damning evidence.  That evidence is contained in the 2009 Harry forensic accounting report that was based largely on 2005-2006 PW OWNERS' entities' consolidated accounting that had been exported to those spreadsheets.  The Harry report delineated the malicious, intentional fraudulent transfers of over $2,000,000 to prevent PLAINTIFFS from collecting their money.  Even though that evidence was not presented, Judge Lafferty found PLAINTIFFS' claim for both successor liability and alter ego valid.  He did so because under law it is not necessary to prove intentional fraud.  All that is required is an inequitable result.

58.    It was not until 2012 that the INSUREDS pursued the matter in the bankruptcy court. Although Plaintiff Seth Samuels had made both GREENE and Ray Hamrick aware of the San Francisco Bar Association's courses on Alter Ego and Successor Liability, and a remarkably on-point case, *Baize v. Eastridge Companies, LLC*, (2006) 47 Cal.Rptr.3rd 763, 142 Cal.App.4th 293, it was only an associate of the Hamrick Firm, Danny Quisenberry, who picked up the ball and used that valuable information. When they did so, they were successful in winning judgments on successor liability and that PW1 and PW2 were alter egos of each other. However, as satisfying as this may initially seem, it was at best a Pyrrhic victory, as both PW1 and PW2 were bankrupt and had been stripped of valuable assets by their OWNERS.

**Negative Influence of GREENE's Failures on Bankruptcy Court and Trustee.**

59. There were additional facts that were available to LIBERTY after they were revealed between the collapse of the state court action and the 2016 demand letter. Following GREENE's 2009 fiascos, the bankruptcy Trustee did not want to move forward on its claim of spoliation because of concerns regarding potential "res judicata" or "collateral estoppel" issues from GREENE's failed spoliation attempt. Consequently, the Trustee made a deal with the PW OWNERS to receive from them approximately $700,000 in lieu of continuing the prosecution, a very small sum considering their liability and net worth. GREENE objected to the deal in the bankruptcy court, but Bankruptcy Court Judge Newsome told GREENE that he was not going to make the Trustee do GREENE's job of prosecuting the PW OWNERS. So, the matter of

19

Plaintiffs' First Amended Complaint for Damages

prosecuting the financially viable and legally liable PW OWNERS came to an end in 2010 before it was revived by the 2012 Bankruptcy Court hearings.

60.     Accordingly, Judge Lafferty rejected the PW shareholders' objections to PLAINTIFFS' claims for alter ego and fraud on creditors, allowing them to proceed against PWCCI on the same claims that they had forfeited in the state court action against the shareholders themselves. Prior to that 2012 Bankruptcy trial the Samuels were told by the INSUREDS that they would pursue the alter ego claims against the OWNERS at the Bankruptcy trial. However, it was only at that trial that the SAMUELS had learned that the INSUREDS had agreed with the PW's attorneys not to pursue the PW OWENRES individually in that trial and at that time. The INSUREDS told the Samuels that could be done separately and more easily after first proving the alter ego of the construction company.

61. The success of prevailing on Successor Liability and Alter Ego claims in the Bankruptcy court proves that the Hamrick firm could have won the case back in 2008 with the evidence they had, if GREENE had not made the above said procedural errors. Had the PW Collection been successful in 2008, PLAINTIFFS would not have had to file further actions and would still have had the financially viable and legally liable PW owners as defendants. They would have collected the millions owed them and further millions in damages caused by fraud.

### The Windows Action

62.     In addition to their attempts to collect the Judgment from the PW Pinewave entities and Everest Insurance, that was the PW OWNERS' insurance carrier, the INSUREDS filed a separate action on behalf of PLAINTIFFS against General Window Corporation and International Window Corporation, the window companies responsible for the defective windows installed in Plaintiffs' Noriega Street Properties and that were at issue in regards to how they were installed and flashed in the original Noriega Arbitration but not at issue with regards to whether they were substandard with regard to their manufacture.

63.     That case, *Chateau de Louis, LLC, et al. v. General Window Corporation dba International Window-Northern, et al.,* San Francisco Superior Court Case No. CGC-08-478447 (the "Windows Action"), was filed on August 8, 2008. Hamrick & Evans were relieved as counsel for the Plaintiff on September 23, 2013. The law offices of Paul Steiner substituted as counsel for Plaintiffs on October 22, 2013. After Steiner took over, he settled the windows action for $130,000, a sum that was substantially compromised because a key test of the windows' water integrity was not properly done because the INSUREDS had failed to properly instruct

20

Plaintiffs' First Amended Complaint for Damages

their experts to conduct certain necessary destructive testing to ascertain whether the leaks were caused by defective manufacture or as a result of improper installation, which was done by PW1. The testing, done at the direction of the INSUREDS, for which PLAINTIFFS were charged over $30,000, failed to delineate whether the building's water leaks were caused by defective manufacture of the windows, or by the improper flashing installation done by the contractors.

**The Case Against the Contractor's Insurer, Everest Insurance Company**

64.     The INSUREDS, now being handled by A. Raymond Hamrick, also brought an action on behalf of PLAINTIFFS against Everest Insurance Company, the insurer of the contractor. During the course of the trial against the contractor's insurer, the hearing judge, Judge Curtis E. A. Karnow, asked for evidence in that arbitration that the Arbitrator intended to award any damages for resultant property damages and that the arbitration award included an award against the contractor for property damage that resulted from water leaks. At the trial, HAMRICK, who claimed to be an expert on insurance matters, claimed that both the issue of property damages was not tried by the Arbitrator and that experts could not delineate what damages resulted from improper flashing as opposed to faulty window manufacture. Thus, he claimed such a showing was not necessary. Despite the fact that Everest's attorneys had made an exhibit of the Arbitration Correction Letter and the fact that the Arbitrator had granted same as requested, Hamrick refused to use that exhibit and introduce that correspondence from PLAINTIFFS' counsel requesting significant corrections to the Award due to specified calculations errors for specific dollar amounts that the Arbitrator had awarded for property damage that occurred from water leaks, but which had been omitted when totaling the dollar amounts had been intended to be awarded.

65.     Despite PLAINTIFFS continued urging, that the award correction letter which was exchanged between counsels and the arbitrator, and essentially adopted by the arbitrator in his amended award, was not presented to the Judge.  That award correction letter request was sent after the tentative award was issued.  All of the requested calculation errors, which included money for water leaks due to substandard flashing, and which had been awarded but omitted were incorporated by the Arbitrator in his final Award.  That evidenced that the Arbitrator did in fact intend to award money for property damage. However, the INSUREDS insisted that the issue of property damage had not been tried by the Arbitrator and refused to submit the evidence to the Karnow court, who found that the Arbitrator had not intended to award money for property damage caused by water, as there was no evidence in the arbitration of the Arbitrator awarding

21

Plaintiffs' First Amended Complaint for Damages

money for property damages caused by water. Judge Karnow further found that you do not get two chances to bite that apple, having not seen the issue of water damage being submitted to the Arbitrator, the Judge denied the INSUREDS claims to bring the matter up again at a new trial.

### LIBERTY'S Bad Faith Failure to Settle

66. The amount due PLAINTIFFS based simply on the underlying arbitration award without reference to other damages caused by the INSUREDS shows that LIBERTY's $500,000 response to the SAMUELS' $1.45 Million demand was clearly unreasonable. As of the original trial date in 2008, the original $1.8 Million had accrued post-judgment interest that increased the total owed to $2.1 Million, but the demands were submitted in 2016, eight years later.

67. LIBERTY was presented with a settlement offer prior to the 2018 trial but refused to accept it or make a reasonable counteroffer based on the facts known or available to them.

68. On August 10, 2016, PLAINTIFFS' attorney, Mr. Steiner, sent a demand for settlement letter pursuant to the provisions of Evidence Code § 1152 to LIBERTY'S attorneys in the amount then available under the existing policy on August 11, 2016 less $1,000 but not less than $1,450,000, dismissal of the cross-complaint for claimed fees, which had disputed value due to the negligent handling by defendants and the unsuccessful attempted corrective action pursued by them on which most of the claimed fees were based, and each party shall pay their own costs and fees. (See **Exhibit 1.**) In response, liberty offered $500,000.

### The Trial Court Decision

69. After many months of further discovery and other acts causing delay, the malpractice action came on for trial on October 10, 2018, in San Francisco Superior Court, the Honorable A. James Robertson II presiding, sitting without a jury, a jury having been duly waived. The Court's written statement of decision was filed on May 24, 2019. Judgment was rendered in favor of PLAINTIFFS, and their respective corporations and against the INSUREDS in-the amount of $4,502;807.48 as of February 20, 2019, and interest at the daily rate of $895.72 was also awarded. In addition, Judge Robertson awarded statutory costs.

70. The Final Proposed Statement of Decision after trial sets forth in detail all the attorney malpractice committed by Underlying Case Defendants and INSUREDS. LIBERTY was fully aware of the malpractice committed by their INSUREDS; and of the harm it caused PLAINTIFFS yet failed to offer a reasonable sum to settle the case. (Attached as **Exhibit 3**-Trial Court Decision.)

//

22

Plaintiffs' First Amended Complaint for Damages

## FIRST CAUSE OF ACTION

### BREACH OF CONTRACT
**(PLAINTIFFS as Judgment Creditor and Third-Party Beneficiary)**

71.     Complainants restate and hereby incorporate by reference the allegations in each of the above paragraphs 1-71.

72.     Once PLAINTIFFS became adjudicated claimants, LIBERTY owed duties and obligations to PLAINTIFF as a judgment creditor and third-party beneficiaries under the Policy. .

73.     LIBERTY breached the terms and provisions of the Policy by failing to pay sums owed to PLAINTIFFS as the judgment creditors and third-party beneficiaries under the Policy. Plaintiffs contend that Liberty's failure to tender the policy amount remaining at the time of the initial demand constitutes a wrongful act, which supports that causes of action asserted herein. Upon information and belief, LIBERTY contends that, years later, its post-appeal tender of the then-remaining amount available under the policy means that no breach occurred.  Since that payment of the remaining policy limits was approximately half of the amount demanded by Mr. Steiner, PLAINTIFFS agree to ensure that the jury instructions and/or post-trial briefing shall make sure to differentiate these two sums, to avoid double-counting.

74.     As a direct and proximate result of LIBERTY'S breach of contractual obligations, PLAINTIFF has suffered damages in an amount to be determined according to proof at the time of trial.

## SECOND CAUSE OF ACTION

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
**(PLAINITFFS as Judgment Creditors and Third-Party Beneficiaries)**

75.     PLAINTIFFS restate and hereby incorporate by reference the allegations in paragraphs 1 through 74 above.

76.     LIBERTY has breached its duty of good faith and fair dealing owed to PLAINTIFF by unreasonably failing and refusing to pay that portion of the judgment covered by the Policy at a time when liability has been established by a final judgment and the undisputed and adjudicated facts demonstrate the coverage defenses asserted by LIBERTY are incorrect and improper.

23

Plaintiffs' First Amended Complaint for Damages

77.    PLAINTIFFS are informed and believe and thereon allege that LIBERTY has breached its duty of good faith and fair dealing owed to PLAINTIFFS by other acts or omissions of which PLAINTIFFS are presently unaware and which will be shown according to proof at the time of trial.

78.    As a proximate result of the above-mentioned unreasonable and bad faith conduct by LIBERTY, PLAINTIFF has and will continue to suffer damages, including but not limited to attorney's fees and costs incurred to recover benefits due under the Policy and other economic and consequential damages in an amount to be proven at the time of trial.

## THIRD CAUSE OF ACTION

### BREACH OF CONTRACT
### (PLAINTIFFS as the assignees of the INSUREDS)

79.    PLAINTIFFS restate and hereby incorporate by reference the allegations in paragraphs 1 through 74 above.

80.    LIBERTY owed duties and obligations to the INSUREDS under the Policy. The INSUREDS assigned its rights under the Policy to PLANIITFFS specifically, PLAINTIFFS' contractual and quasi-contractual rights to recover assignable economic damages under the Policy.

81.    LIBERTY breached the terms and provisions of the Policy, including, to settle the underlying action against PLAINTIFFS, and to indemnify PLAINTIFFS against the judgment obtained by PLAINTIFFS. As such, LIBERTY breached such duties owed to PLAINTIFFS as the assignee of the INSUREDS'S rights described above.

82.    As a direct and proximate result of LIBERTY'S breach of contractual obligations, PLAINTIFF has suffered damages in an amount to be determined according to proof at the time of trial.

//

//

//

24

Plaintiffs' First Amended Complaint for Damages

## FOURTH CAUSE OF ACTION

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (PLAINTIFFS as the assignees of the INSUREDS)

83.    PLAINTIFFS restate and hereby incorporate by reference the allegations in paragraphs 1 through 74 above.

84.    LIBERTY has breached its duties of good faith and fair dealing owed to PLAINTIFFS, as the assignee of the rights of the INSUREDS, in the following respects:

a.  Unreasonably continuing the defense of INSUREDS over demands to settle despite knowing and having the evidence that the actions of their INSUREDS was indefensible and that those acts caused PLAINTIFFS harm requiring settlement.

b.  Unreasonably failing and refusing to fully indemnify the INSUREDS, despite the demand to do so and even though such indemnification were benefits due and owing under the Policy.

c.  Unreasonably failing to accept a clear, unequivocal and reasonable offer to settle the underlying action within the Policy limits, thereby exposing the INSUREDS to an excess judgment.

d.  Unreasonably failing to conduct a fair, thorough, independent and balanced investigation of the underlying claims.

e.  Unreasonably failing to give at least as much consideration to the interests of its INSUREDSs as it gave to its own interests.

f.  Unreasonably failing to attempt in good faith to effectuate a prompt, fair and equitable settlement of PLAINTIFFS' claim against the INSUREDS once liability had become clear.

85.    PLAINTIFFS are informed and believe and thereon allege that LIBERTY has breached their duty of good faith and fair dealing owed to PLAINTIFFS, as the assignees of the rights of the INSUREDS, by other acts or omissions of which PLAINTIFFS are presently unaware and which will be shown according to proof at the time of trial.

25

Plaintiffs' First Amended Complaint for Damages

86. As a proximate result of the above-mentioned unreasonable and bad faith conduct by LIBERTY, PLAINTIFFS have suffered and will continue to suffer damages-- economic and consequential damages, including but not limited to the unpaid judgment totaling $5,824,023.60 plus 10% statutory interest per year from the date the judgment was entered less credit for any money paid, for a total amount to be proven at the time of trial.

87. As a further proximate result of the unreasonable and bad faith conduct of LIBERTY, PLAINTIFFS were compelled to retain legal counsel to obtain the benefits due under the Policy. Therefore, LIBERTY is liable to PLAINTIFFS for those attorneys' fees and costs necessary and incurred by PLAINTIFFS to obtain the benefits of the Policy, in a sum to be determined at the time of trial.

### III. PRAYER

WHEREFORE, PLAINTIFFS PRAY FOR THE FOLLOWING:

1. As to the First Cause of Action for Breach of Contract as Judgment Creditor:
   a. Damages according to proof in a sum to be determined at trial.
   b. Costs of the suit herein; and
   c. Such other and future relief as the Court deems just and proper.

2. As to the Second Cause of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing as Judgment Creditor:
   a. Damages according to proof in a sum to be determined at trial.
   b. Attorneys' fees and costs incurred by PLAINTIFFS to obtain the benefits due under the Policy;
   c. Costs of the suit herein; and
   d. Such other and further relief as the Court deems just and proper.

3. As to the Third Cause of Action for Breach of Contract as the assignee of Hamrick & Evans:
   a. Damages according to proof in a sum to be determined at trial.
   b. Costs of suit incurred herein; and
   c. Such other and further relief as the Court deems just and proper.

26

Plaintiffs' First Amended Complaint for Damages

4.  As to the Fourth Cause of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing as assignee of the INSUREDS:

   a.  Damages according to proof in a sum to be determined at trial.

   b.  Attorneys' fees and costs incurred by PLAINTIFFS to obtain the benefits due under the Policy in an amount to be determined at trial.

   c.  Costs of the suit herein; and

   d.  Such other and further relief as the court deems just and proper.

Dated: September 20, 2024

LAW OFFICES OF PAUL J. STEINER

By: _____
Paul J. Steiner
Attorneys for Plaintiffs Seth Samuels,
Stephen Samuels, Stacy Samuels, Chateau
De Louis, LLC, No. Nine LLC, and Real
Enterprises, LLC

## JURY DEMAND

Plaintiff demand trial by jury on all issues so triable.

Dated: September 20, 2024

LAW OFFICES OF PAUL J. STEINER

By: _____
Paul J. Steiner
Attorneys for Plaintiffs Seth Samuels,
Stephen Samuels, Stacy Samuels, Chateau
De Louis, LLC, No. Nine LLC, and Real
Enterprises, LLC

## CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper

27

Plaintiffs' First Amended Complaint for Damages

purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Dated: September 20, 2024

Respectfully submitted,

LAW OFFICES OF PAUL J. STEINER

By: _____

Paul J. Steiner
Attorneys for Plaintiffs Seth Samuels,
Stephen Samuels, Stacy Samuels, Chateau
De Louis, LLC, No. Nine LLC, and Real
Enterprises, LLC

28

Plaintiffs' First Amended Complaint for Damages

# EXHIBIT 1

# Plaintiff's August 10, 2016

# Settlement Demand

# EXHIBIT 2

# Intentionally Omitted

# EXHIBIT 3

# Underlying Trial Court Decision

# May 24, 2019

# EXHIBIT 4

# Hamrick & Evans Errors and Omissions Policy